Filed 12/24/13  (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| CHRISTOPHER WILLIAMS, on behalf of himself and all others similarly situated,<br><br>　　　　　　Petitioners,<br><br>　v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>　　　　　　Respondent;<br><br>ALLSTATE INSURANCE COMPANY,<br><br>　　　　　　Real Party in Interest. | B244043<br><br>(Los Angeles County<br>Super. Ct. No. BC382577)<br><br><br><br>ORDER MODIFYING OPINION |


GOOD CAUSE appearing, the opinion filed December 6, 2013, in the above entitled matter is hereby modified as follows:

On page 1, first paragraph that reads "APPEAL from a judgment of the Superior Court of Los Angeles County.  John Shepard Wiley Jr., Judge.  Vacated and remanded with direction." should be deleted and replaced with "ORIGINAL PROCEEDING in mandate.  John Shepard Wiley Jr., Judge.  Petition granted.

On page 2, lines 1 and 2, replace "Appellant" with "Petitioner".

On page 4, lines 3 and 14 replace "Appellant" with "Petitioner".

On page 6, lines 9, 10, 12 replace "Appellant" with "Petitioner".

On page 15, line 3 "Appellant" with "Petitioner".

On page 19, before the first sentence in the DISPOSITION add the following sentence "The petition is granted."

[End of modifications.]

There is no change in the judgment.

_____
BIGELOW, P. J.                    RUBIN, J.                    FLIER, J.

Filed 12/6/13 (unmodified version)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| CHRISTOPHER WILLIAMS, on behalf of himself and all others similarly situated,<br><br>Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>Respondent;<br><br>ALLSTATE INSURANCE COMPANY,<br><br>Real Party in Interest. | B244043<br><br>(Los Angeles County<br>Super. Ct. No. BC382577) |


APPEAL from a judgment of the Superior Court of Los Angeles County. John Shepard Wiley Jr., Judge. Vacated and remanded with direction.


Law Offices of Kevin T. Barnes, Kevin T. Barnes and Gregg Lander; Trush Law Office and James M. Trush, for Petitioner.


No appearance for Respondent.


Seyfarth Shaw, Andrew M. Paley, Sheryl L. Skibbe, James M. Harris and Kiran Aftab Seldon, for Real Party in Interest.

_____

Appellant Christopher Williams petitions for a writ of mandate directing the trial court to vacate its order decertifying appellant's class action claim that alleged Allstate Insurance Company failed to pay overtime wages to Allstate's auto field adjusters. A writ shall issue forthwith directing the trial court to vacate its decertification order and to recertify the class.

## FACTS AND PROCEEDINGS

Allstate Insurance Company employs several hundred auto field adjusters in California. Auto field adjusters travel to sites such as body shops to inspect, and analyze the value of, damaged vehicles. In 2005, Allstate changed the classification of its auto field adjusters from salaried employees to hourly employees in response to litigation challenging their misclassification as employees exempt from the protection of overtime wage laws. (*Jimenez v. Allstate Ins. Co.* (C.D. Cal. Apr. 18, 2012, No. LA CV 10-08486) 2012 WL 1366052,*4 (*Jimenez*).)

Auto field adjusters receive their daily work schedules of vehicle inspection appointments by logging onto Allstate's "Work Force Management System" software loaded onto their work laptops. Although the adjusters are hourly employees entitled to overtime if they work more than 8 hours a day or 40 hours a week, the Work Force Management System software is not a time record keeping program, nor does Allstate maintain any other time clock system.[1] An Allstate executive testified in deposition: "Q. Is there any timekeeping system such as a time clock or a computer punch-in and punch-out system that auto adjusters punch in and punch out in order to keep track of the

---

[1] In its initially unsuccessful opposition to appellant's motion for certification, Allstate wrote the Work Force Management System is not a "timeclock[] and cannot be used to track when adjusters are performing work-related tasks." And Allstate's return to appellant's petition for writ of mandate states the Work Force Management System and related software "does not track hours worked by adjusters, nor does Allstate use it for this purpose. . . . Log-in information from these software programs cannot answer whether or how long an adjuster was working, or distinguish between work and personal use."

2

start and the end of their day? [¶] A. No timekeeping punch-in, punch out system, no. [¶] Q. Is there any timekeeping system of any type, whether it's a time clock, a computer system or a manual system, that records the actual start time and the actual end time of the auto adjuster's workday? . . . [¶] A. No." Rather than track the actual hours an adjuster works, the Work Force Management System instead presumes each adjuster's eight-hour workday begins when the adjuster arrives at his first vehicle-inspection appointment of the day. As the Allstate executive explained, "Their day begins at the first stop."

Allstate's presumption that an adjuster's workday begins with the first appointment as set by the Work Force Management System does not take into account any work the adjuster may have performed before the day's first appointment. As the Allstate executive explained in deposition, "Q. The eight-hour workday upon which the system is based assumes that the eight-hour workday begins at the first appointment, correct? [¶] A. Yes. . . . [¶] Q. [T]he eight-hour workday upon which the system is based does not take into account any work that may have been done before the first appointment; isn't that right? . . . [¶] A. That's correct. The system doesn't take into account anything that somebody might have done prior to that first assignment."

Belying Allstate's assumption of an 8-hour workday, appellant submitted declarations from numerous adjusters stating they typically worked more than 8 hours a day and 40 hours a week after Allstate reclassified them from salaried to hourly employees. Among the overtime tasks those adjusters declared they performed outside their eight-hour shifts were (1) logging onto their work computers, (2) downloading their assignments, (3) making courtesy calls to auto repair shops and car owners to confirm appointments, (4) checking their voice mail, and (5) traveling to and from their first and last appointments of the day. For an adjuster to work overtime, Allstate's official company policy required the adjuster to get his supervisor's prior approval. But the adjusters' declarations stated the adjusters hesitated to request overtime because they did not want to be perceived as "bad" employees.

In 2007, appellant Christopher Williams filed a class action complaint for himself and all others similarly situated. The complaint sought class certification for all Allstate auto field adjusters working in California, a group of several hundred employees defined as "all auto adjusters in California that perform field inspections using the Workforce Management System ('WFMS') with the title Claim Adjuster, Senior Claim Adjuster, Staff Claim Adjuster, Claim Service Adjuster, Senior Claim Service Adjuster, Staff Claim Service Adjuster, Appraiser, Claim Representative, Claim Specialist and Claim Consultant." The complaint alleged Allstate had a policy and practice of not compensating adjusters for work performed before they arrived at their first vehicle inspection of the day and for work performed after completing the last inspection of the day. The complaint alleged various wage violation causes of action.

Appellant moved for class certification. At the December 2010 class certification hearing, the trial court found evidence in the record "supports a class of Auto Field Adjusters with respect to off-the-clock claims . . . that are performed pre-first inspection and post-last inspection in connection with logging on and off the computer timekeeping system, including, but not limited to, setting voicemail messages and checking for schedule and travel changes." The court therefore certified an "Off the Clock" class, defined as Allstate's "California-based hourly-paid Auto Field Adjusters from January 1, 2005 to the present, to the extent that [Allstate] failed to pay for off-the-clock work for the following specific tasks performed prior to the first inspection of the day: logging on and off computer systems, preparing and checking voicemail messages, checking for schedule and travel changes, obtaining directions to the first inspection if there is a travel change, and making courtesy calls."[2]

Half a year later in June 2011, the United States Supreme Court handed down its decision in *Wal-Mart Stores, Inc. v. Dukes* (2011) 131 S.Ct. 2541 (*Dukes*). *Dukes*

---

[2]     The court also certified a "Wage Statement" class alleging inaccurate wage statements, and denied certification of "Meal Period" and "Termination Wage" classes. Those rulings are not at issue here.

4

involved class certification of 1.5 million current and former female Wal-Mart employees from 3,400 stores who alleged Wal-Mart denied them promotions or pay raises because of their gender. (*Id.* at pp. 2547-2548.) The Supreme Court noted that the 1.5 million nationwide claimants were required to prove that thousands of store managers had the same discriminatory intent in preferring men over women for promotions and pay raises. The Supreme Court found the women could not pursue their claims as a class action because they lacked evidence that they did not receive promotions or pay raises for the same reason, namely their gender. In reversing class certification, *Dukes* found that there was no unifying theory holding together "literally millions of employment decisions." (*Id.* at p. 2552.)

In a trial court status conference in July 2011 one month after *Dukes*, the parties and trial court discussed *Dukes*. The trial court thereafter permitted Allstate to file a motion based on *Dukes* for decertification of the Off-the-Clock class. In its decertification motion, Allstate emphasized two points from *Dukes*. First, "there must be some 'glue' holding the class members' claims together, such that common facts can resolve the claims for everyone in the class." And, second, "a trial-by-formula using statistical sampling is an improper means to try class claims, as it deprives a defendant of due process by precluding a defendant from proving its individual defenses against each class member." Allstate told the trial court, "In light of the U.S. Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes[, supra,]* 131 S.Ct. 2541, which the Court admitted changed the relevant legal landscape for this case, and additional discovery since the class certification order, it is apparent that the close call on certification must be reversed."

The trial court agreed, and decertified the Off-the-Clock class (as well as a corresponding Unfair Competition Claim). Relying on *Dukes*, the trial court's written order stated Allstate's decertification "motion is granted because [*Dukes, supra,*] 131 S.Ct. 2541 has changed the law." The trial court concluded that "After *Dukes*, Allstate is entitled to litigate its defenses to the claims of each individual class member." Allstate's defenses included purported evidence that not all adjusters worked off the

5

clock, and for that portion of those adjusters who might have worked off the clock, their time was de minimis.  (See *Anderson v. Mt. Clemens Pottery Co.* (1946) 328 U.S. 680, 692 ["a few seconds or minutes of work beyond the scheduled working hours [are mere] trifles [and] may be disregarded"].)  According to the trial court's order, a "trial in which Allstate presents evidence of affirmative defenses to more than 200 individuals would be unmanageable," making class certification inappropriate.

Appellant filed in this court a petition for writ of mandate, which we summarily denied.  Appellant then filed a petition for review by our Supreme Court.  Our Supreme Court granted the petition and returned the matter to us with directions to issue an order to show cause why the relief sought in appellant's petition should not be granted.  We issued the order to show cause, received further briefing, and held argument.

**DISCUSSION**

1.     *Legal Principles Governing Class Certification*

"The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives.  [Citations.]  'In turn, the "community of interest requirement embodies three factors:  (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' [Citations.]"  (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)  "A motion to certify a class action is not a trial on the merits, nor does it function as a motion for summary judgment."  (*Carabini v. Superior Court* (1994) 26 Cal.App.4th 239, 245.)  Class certification " 'is essentially a procedural [question] that does not ask whether an action is legally or factually meritorious.' "  (*Brinker* at p. 1023.)  A certification motion does not invite the trial court to resolve disputed facts in a free-floating inquiry aimed at deciding the merits of the plaintiff's claims.  The trial court ordinarily must assume the claims have merit.  (*Id.* at

6

p. 1023 ["resolution of disputes over the merits of a case generally must be postponed until after class certification has been decided, with the court assuming for purposes of the certification motion that any claims have merit."]; *Dailey v. Sears, Roebuck and Co.* (2013) 214 Cal.App.4th 974, 990 (*Dailey*).)

We review a decertification order for an abuse of discretion. (*Brinker, supra,* 53 Cal.4th at p. 1022; *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326; *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1530.) Decertification requires new law or newly discovered evidence showing changed circumstances. (*Weinstat v. Dentsply Internat., Inc.* (2010) 180 Cal.App.4th 1213, 1225.) A motion for decertification is not an opportunity for a disgruntled class defendant to seek a do-over of its previously unsuccessful opposition to certification. "Modifications of an original class ruling, including decertifications, typically occur in response to a significant change in circumstances, and '[i]n the absence of materially changed or clarified circumstances . . . courts should not condone a series of rearguments on the class issues.' [Citation.]" (*Driver v. AppleIllinois, LLC* (N.D. Ill., Mar. 2, 2012, No. 06 C 6149) 2012 WL 689169, *1 (*Driver*).) "A class should be decertified 'only where it is clear there exist changed circumstances making continued class action treatment improper.' " (*Green v. Obledo* (1981) 29 Cal.3d 126, 147.)

Decertification resting on improper legal criteria or an incorrect assumption is an abuse of discretion. (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429; see also *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311.) In an exception to a customary rule of appellate practice, we review the court's rationale for its order. (The customary rule is to review the result of the court's order, *not* its rationale.) (*Weinstat v. Dentsply Internat., Inc., supra,* 180 Cal.App.4th at pp. 1223-1224; Witkin Proc. (2008) Pleading, § 314, p. 431.) We thus review only the reasons the court stated for its order, and we reverse if those reasons do not support the order. (*Ramirez v. Balboa Thrift and Loan* (2013) 215 Cal.App.4th 765, 776; *Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286, 1297-1298; *Bufil v. Dollar Financial Group, Inc.* (2008) 162 Cal.App.4th 1193, 1205 [reversal required even when substantial evidence supports the court's order if the court's

stated reasons do not support the order].)  Finally, we may not use the court's oral statements to impeach its written order.  (*Silverado Modjeska Recreation and Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 300-301; *Collins v. Hertz Corp.* (2006) 144 Cal.App.4th 64, 77-78.)

2.      Dukes' *Discussion of Affirmative Defenses Does Not Support Decertification (*Dukes*, Sec. III at pp. 2557-2561)*

The trial court based its decertification order on *Dukes*, stating "After *Dukes*, Allstate is entitled to litigate its defenses to the claims of each individual class member." According to the court, Allstate's entitlement in the wake of *Dukes* to individually litigate its defenses against each adjuster's Off-the-Clock claims made those claims unmanageable as a class action.  Those defenses included purported evidence that (1) a particular adjuster did not work off the clock, or if he did, Allstate did not know about it, and, (2) any time worked off the clock was de minimis.

The trial court erred in concluding *Dukes* required decertification.  In *Dukes*, a nationwide class of 1.5 million current and former female employees from 3,400 stores sued Wal-Mart, alleging that the company engaged in a pattern or practice of gender discrimination in violation of Title VII of the Civil Rights Act of 1964.  The female plaintiffs were required to prove that thousands of store managers shared the same discriminatory animus toward women in denying them promotions and pay raises.  The Supreme Court reversed the district court's certification order on the grounds that the plaintiffs could not offer "significant proof that Wal-Mart operated under a general policy of discrimination."  In reversing class certification, the Court found that there was no unifying theory holding together "literally millions of employment decisions" that turned on the subjective intents of thousands of supervisors in thousands of stores to explain for each class member the "crucial question *why was I disfavored"* for a promotion or pay raise.  (Italics original.)  (*Dukes, supra,* 131 S.Ct. at p. 2552; see e.g. *Espinoza v. 953 Assocs. LLC* (S.D.N.Y. 2011) 280 F.R.D. 113, 130 [distinguished Dukes where "claims were based on the countless subjective decisions made by Wal–Mart's local

8

supervisors regarding compensation and promotions" from worker's overtime claims where workers alleged employer "failed to pay minimum wages and overtime compensation as a result of certain policies and practices."]; see also *Ross v. RBS Citizens, N.A.* (2012 7th Cir.) 667 F.3d 900, 908-910 judgment vacated and matter remanded for further reconsideration in light of *Comcast Corp. v. Behrend* (2013) 133 S.Ct. 1426[3] [distinguishing *Dukes* in case involving 1,129 class members who alleged they were unlawfully denied overtime because of the employer's "unofficial policy" which was "the glue holding together [the class members] based on the common question of whether an unlawful overtime policy prevented employees from collecting lawfully earned overtime compensation."].)

We agree with those courts that have found *Dukes* distinguishable in comparable situations. Because *Dukes* involved federal class action law, our analysis starts briefly with Rule 23 of the Federal Rules of Civil Procedure (FRCP). Subpart (a) of Rule 23 establishes four requirements for a class action, commonly identified with shorthand expressions as numerosity, commonality, typicality, and adequacy of representation. (*Dukes, supra,* 131 S.Ct. at p. 2550.) Subpart (b) of Rule 23 recognizes three types of class actions. A proposed class plaintiff must fall under the definition of one of those three types from subpart (b) in order to proceed as a class action. (See FRCP, Rule 23(b)(1)-(3); *Comcast Corp. v. Behrend, supra,* 133 S.Ct. at p. 1432; *Wang v. Chinese Daily News, Inc.* (2013 9th Cir.) __ F.3d __ [2013 WL 4712728, *2]; *Ellis v. Costco Wholesale Corp.* (N.D. Cal. 2012) 285 F.R.D. 492, 535 ["In addition to the threshold requirements of Rule 23(a), plaintiffs seeking class certification must also satisfy one of the prongs of Rule 23(b)."].) One type of class action involves injunctive or declaratory relief that remedies the injury of all class members. Rule 23(b)(2) provides: "A class action may be maintained if Rule 23(a) [regarding numerosity etc.] is satisfied and if: . . .

---

[3] The Supreme Court's grant and remand of *Ross* was not equivalent to a reversal on the merits. Instead, it permitted the lower court to take into account developments in the law rendered since the 7th Circuit decided *Ross*. (*Tamas v. Family Video Movie Club, Ind.* (N.D. Ill. Aug. 13, 2013, No. 11 C 1024) 2013 WL 4080649, *6.)

9

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . ." (FRCP Rule 23(b)(2).)

The portion of *Dukes* on which the trial court's decertification order focused was *Dukes'* discussion of prosecution of a Title VII gender discrimination claim under Rule 23(b)(2). *Dukes* noted that Rule 23(b)(2) does not apply when a class-wide injunction will not provide relief to the aggrieved plaintiffs. *Dukes* explained, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." (Italics original.) (*Dukes, supra,* 131 S.Ct. at p. 2557)[4] Nor, *Dukes* noted, does Rule 23(b)(2) apply where the primary relief sought is individualized monetary claims. (See e.g. *Ries v. Ariz. Bevs. United States LLC, Hornell Brewing Co.* (N.D. Cal. 2012) 287 F.R.D. 523, 541; *Ellis v. Costco Wholesale Corp., supra,* 285 F.R.D. at p. 535.) *Dukes* held that money damages must be no more than an incidental component of the class's claim when the class is proceeding under Rule 23(b)(2). Because the female employees in *Dukes* were seeking back pay as their principal form of relief, *Dukes* held "We . . . conclude that [the female employees'] claims for backpay were improperly certified under [Rule 23(b)(2)]. Our opinion in [an earlier case] expressed serious doubt about whether claims for monetary relief may be certified under [Rule 23(b)(2)]. We now hold that they may not, at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief." (*Dukes* at p. 2557.)

---

**4** *Dukes* observed that a civil rights challenge to racial segregation is a prototypical example of a Rule 23(b)(2) type case: " 'Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture. [Citation.] In particular, the Rule reflects a series of decisions involving challenges to racial segregation – conduct that was remedied by a single classwide order." (*Dukes, supra,* 131 S.Ct. at pp. 2557-2558.)

Despite the trial court's turning to *Dukes'* analysis of the restrictions on, if not outright unavailability of, money damages under rule 23(b)(2) to explain the trial court's decertification order, appellant was not pursuing a 23(b)(2) type of class action. Appellant instead sought class certification under California's class action statute, Code of Civil Procedure section 382.[5]  Section 382 is analogous to subpart (a) of Rule 23, which establishes the four requirements of a class action.  (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 318.)  The trial court's reliance on *Dukes'* analysis of subpart (b)(2) of Rule 23 – a class action seeking injunctive relief – was thus misplaced because appellant's class members here were seeking principally, if not exclusively, monetary damages, that the federal rules establish is a different type of class action.  (Compare Rule 23(b)(2) with 23(b)(1) and 23(b)(3); *Dukes, supra,* 131 S.Ct. at p. 2558 ["monetary claims belong in Rule 23(b)(3)"].)  More fundamentally, the concern expressed in *Dukes* about the unmanageability of trying 1.5 million claims which depended on proof of the subjective intents of thousands of individual supervisors is not present here.  Appellant asserts there is a companywide policy to deny overtime pay.  The resolution of that issue does not involve the subjective intents of countless supervisors.

The Supreme Court's second area of focus in Part III of *Dukes* involved the statutory affirmative defenses in the anti-discrimination statute Title VII.  Because the affirmative defenses were statutory, *Dukes* concluded a class proceeding could not deprive Wal-Mart of its right to present those defenses.  (*Dukes, supra,* 131 S.Ct. at pp. 2560-2561.)  As those affirmative defenses required individualized evidence, *Dukes* disapproved a "Trial by Formula" of Wal-Mart's affirmative defenses because it prevented Wal-Mart from offering its individualized evidence.  (*Id.* at p. 2561.)  Under a "Trial by Formula," the trial court will accept evidence from a statistically derived

---

[5]  Section 382 states:  "If the consent of any one who should have been joined as plaintiff cannot be obtained, he may be made a defendant, the reason thereof being stated in the complaint; and when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

11

representative subset of several hundred Wal-Mart female employees to determine the percentage who suffered gender discrimination and to calculate the average back pay of the women in that subset. The trial court will then conduct several mathematical operations involving the percentage, the average back pay, and the size of the entire class to calculate the entire class recovery. The details of that calculation are unimportant here other than to note that *Dukes* rejected such an approach. (*Id.* at p. 2561.) "The [*Dukes*] Court rejected this 'novel project,' [of Trial by Formula] holding that Wal-Mart was 'entitled to litigate its statutory defenses' to the individual claims of each member seeking backpay." (*In re TFT-LCD (Flat Panel) Antitrust Litigation* (N.D. Cal. 2012) 2012 WL 253298, *5.)

Trial by Formula is a method of calculating damages.[6] Damage calculations have little, if any, relevance at the certification stage before the trial court and parties have reached the merits of the class claims. At the certification stage, the concern is whether class members have raised a justiciable question applicable to all class members. Although Allstate may have presented evidence that its official policies are lawful, "this showing does not end the inquiry." (*Jimenez, supra,* 2012 WL 1366052, *8.) Here, the question is whether Allstate had a practice of not paying adjusters for off-the-clock time. (*Ibid.*) The answer to that question will apply to the entire class of adjusters. If the answer to that question is "yes" – which is the answer the trial court initially assumed when it first certified the Off-the-Clock class, and is the answer we must presume in reviewing decertification (*Brinker, supra,* 53 Cal.4th at p. 1023) – then, in *Duke's* phrase, that answer is the "glue" that binds all the class members. (*Dukes, supra,* 131 S.Ct. at p. 2552 [a class requires the "glue" of a single answer for a question applicable to all class members].) If some adjusters had more uncompensated time off the clock than other adjusters, that difference goes to damages. But differences in the amount of

---

**6**      California law permits statistical sampling to determine damages. Whether California permits statistical sampling to prove liability is "more controversial" and is a question currently before our Supreme Court. (*Dailey, supra,* 214 Cal.App.4th at p. 998, fn. 10; See *Sav-on Stores v, Inc. v. Superior Court, supra,* 34 Cal.4th at pp. 332-333.)

individual damages do not by themselves defeat class certification. (*Stearns v. Ticketmaster Corp.* (2011) 655 F.3d 1013, 1026; *Yokoyama v. Midland Nat'l Life Ins. Co.* (2010) 594 F.3d 1087, 1094; contrast *Comcast Corp. v. Behrend, supra,* 133 S.Ct. at pp. 1432-1433 [under federal class action rules, differences in method of calculating damages arising from individualized damages may defeat certification of class of 2 million subscribers].) "As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages." (*Brinker* at p. 1022.) Indeed, in initially certifying the Off-the-Clock class, the trial court necessarily rejected Allstate's argument that the varying amounts of allegedly unpaid back pay defeated class certification. In opposing the original certification order, Allstate noted it had "submitted numerous declarations attesting to the fact that adjusters do not work off the clock. Moreover . . . testimony proffered by [appellant] varies greatly as to the type of tasks supposedly performed off the clock; the frequency of this work; and the length of time it took. [¶] Indeed, [appellant's] testimony about his alleged off the clock work is dramatically different from the experience of other adjusters." Allstate's argument notwithstanding, the court's original certification order found "common issues of law and fact predominate" for the Off the Clock Class, thereby implicitly rejecting Allstate's contention that varying damages defeated class certification. (Accord *Jimenez, supra,* 2012 WL 1366052, *15 [class plaintiffs' failure to show statistical sampling was a proper method of calculating individual damages did not defeat class certification "with respect to liability" because individualized calculation of damages does not defeat certification].)

In fact, the federal district court in a companion proceeding against Allstate involving Allstate's failure to pay overtime to adjusters other than auto field adjusters has rejected an argument similar to what Allstate asserts here. In *Jimenez, supra,* 2012 WL 1366052, 1,300 California-based Allstate claims adjusters assigned to 13 offices throughout the state filed a federal class action against Allstate in which they alleged multiple labor violations, including unpaid overtime and wrongful denial of meal and rest periods. Relevant to our case here, the *Jimenez* plaintiffs alleged a company-wide policy

13

of discouraging and limiting overtime. In response, Allstate asserted two affirmative defenses precluded class certification. Allstate asserted it did not "(1) . . . have constructive or actual knowledge that Plaintiff and other class members were working off-the-clock; and (2) the amount of unpaid overtime is *de minimis*." Finding the affirmative defenses did not defeat class certification, the federal court explained that with "respect to [Allstate's] *de minimis* defense, it can be addressed through representative testimony . . . . With respect to whether [Allstate] had actual or constructive knowledge of the unpaid overtime, the standard of constructive knowledge is amenable to class treatment. Thus, Plaintiff need not demonstrate that every manager knew every time an employee worked off-the-clock; instead, Plaintiff can demonstrate that [Allstate] should have known that its employees were regularly working off-the-clock as a result of its policies regarding the reporting of overtime, the recording of time worked by claims adjusters, its insistence on having its supervisory personnel monitor all requests for overtime, and the position of certain of its managerial personnel about the need to limit overtime for budgetary or other performance-related reasons. Further, as discussed above, [Allstate] will have an opportunity to raise these defenses with the representative witnesses. In sum, when compared to the manner of proof as to common questions, these defenses do not raise sufficiently individualized questions that either preclude certification or make a class process unfair." (*Id.* at *20.) Certifying the overtime class, the district court found the claims adjusters had shown the existence of the following common questions warranted class treatment: "(i) whether [Allstate] had a common and widespread practice of not following its policies regarding overtime; (ii) whether [Allstate] knew or should have known that claims adjusters were working off-the-clock without compensation; and (iii) whether Allstate managers who were so informed elected to take no corrective steps with respect to adjusters who were working overtime without compensation." (*Id.* at *11.)

14

*3.* Dukes *Discussion of Commonality Does Not Support Decertification (*Dukes*, Sec. II, at pp. 2550-2557)*

In initially granting certification, the trial court concluded that appellant's Off-the-Clock claim satisfied the requirements of numerosity, commonality, typicality, and adequacy of representation needed for class certification. The court found:

● The class was "ascertainable and identifiable from [Allstate's] corporate records because [appellant] alleges that all California Field Adjusters worked off the clock by performing the aforementioned tasks prior to the first inspection of the day."

● "[C]ommon issues of law and fact predominate over individual issues for the Off the Clock . . . classes."

● "The Classes are so numerous that joinder would be impracticable."

● "The claims of the Class Representative are typical of the claims of the members of the Classes."

● "The interests of the Classes will be adequately represented by the Class Representative."

● "The Court further finds that a class action is a superior procedural device for resolution of these claims."

In its post-*Dukes* motion for decertification, Allstate argued it had a policy forbidding adjusters from working before each day's first appointment, and Allstate asserted it instructed its adjusters to follow that policy. Allstate also argued not every adjuster claimed to work off the clock, and among those who claimed they worked off the clock, they varied in how much time they worked, with some number of them working *de minimis* time.

*Dukes* did not make the trial court's original certification order incorrect. In particular, and contrary to Allstate's assertion here, *Dukes* did not establish an absence of commonality here. First of all, the trial court's decertification order did not address commonality, nor did it quote or cite to part II of *Dukes* which discussed commonality.

15

(*Ramirez v. Balboa Thrift and Loan* (2013) 215 Cal.App.4th 765, 776 [appellate court considers only trial court's stated reasons for decertification]; *Jaimez v. Daiohs USA, Inc., supra,* 181 Cal.App.4th at pp. 1297-1298; *Bufil v. Dollar Financial Group, Inc., supra,* 162 Cal.App.4th at p. 1205.) Furthermore, the decertification order cited no new evidence in support of overturning the court's previous commonality finding.[7] The decertification order asserted that appellant's evidence showed that only 58 percent of adjusters worked off the clock, meaning 42 percent did not. But this was not new post-*Dukes* evidence, nor is clear that it means what the trial court seems to suggest. The 58 percent figure came from a February 2010 declaration of appellant's statistical expert filed in support of appellant's motion for certification. The statistician's declaration stated he calculated that 58 percent of all "person-workdays" accrued overtime as measured by a statistical sampling of the time adjusters logged onto the Work Force Management System before the presumed 8:00 a.m. start time of each adjuster's workday. Properly understood, the statistician does not appear to declare that only 58 percent of adjusters claimed to have worked any overtime (or if he does so declare, he does so inconclusively); rather, when one multiplied the number of all days worked by all adjusters by the number of adjusters, more than half of those days involved overtime.

Although the trial court's decertification order did not rely on *Dukes'* discussion of the commonality requirement, some courts have concluded *Dukes* clarified the commonality requirement for class certification. (See e.g. *Schulz v. QualxServ, LLC* (S.D. Cal. 2012) 2012 WL 1439066, *3.) Commonality exists when the class claim poses a question for which the answer advances the litigation. As *Dukes* explained, class "claims must depend upon a common contention . . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." (*Dukes, supra,* 131 S.Ct. at p. 2551.) In

---

[7]    Allstate took additional discovery before filing its decertification motion, but the court did not cite any of that discovery in its decertification order.

16

*Dukes*, 1.5 million female employees could not show their failure to receive promotions or pay raises was amenable to class treatment because each manager had individual discretion over those decisions. No Wal-Mart policy explained the alleged discriminatory practices of individual supervisors. (Contrast *Wang v. Chinese Daily News, Inc., supra,* 2013 WL 4712728 ["*Wal–Mart* is factually distinguishable . . . Most important, the class here is much smaller. It encompasses only about 200 employees, all of whom work or worked at the same . . . office. Plaintiffs' claims do not depend upon establishing commonalities among 1.5 million employees and millions of discretionary employment decisions."].) As *Dukes* explained, "Without some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored.*" (*Id.* at p. 2552, original italics.)[8]

Here, in contrast, the alleged commonality was the practice of adjusters working off-the-clock in order to complete their daily work. Under California law, an employer who knew, or should have known, of overtime work exposes the employer to liability. (*Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 585; *York v. Starbucks* (C.D. Cal) 2011 WL 8199987, *28-29.) A company-wide practice can sustain a common question of fact or law that supports commonality for class certification. (*Dukes, supra,* 131 S.Ct. at pp. 2556-2557 ["convincing proof of a companywide discriminatory pay and promotion

---

[8] Judge Richard Posner of the 7th Circuit described Wal-Mart as follows in *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (7th Cir. 2012) 672 F.3d 482: "Wal-Mart holds that if employment discrimination is practiced by the employing company's local managers, exercising discretion granted them by top management (granted them as a matter of necessity, in Wal–Mart's case, because the company has 1.4 million U.S. employees), rather than implementing a uniform policy established by top management to govern the local managers, a class action by more than a million current and former employees is unmanageable; the incidents of discrimination complained of do not present a common issue that could be resolved efficiently in a single proceeding. . . because there was no company-wide policy to challenge in Wal-Mart—the only relevant corporate policies were a policy *forbidding* sex discrimination and a policy of delegating employment decisions to local managers—there was no common issue to justify class treatment." (*Id.* at p. 488, original italics.)

17

policy" could have "established the existence of [a] common question"].) "Even a single common question" can suffice to create commonality. (*Dukes* at p. 2556; *Wang v. Chinese Daily News, Inc., supra,* 2013 WL 4712728, *4; see e.g. *Driver, supra,* 2012 WL 689169, *4 [in case challenging practice of using tipped employees in duties arguably unrelated to their tipped occupations, court applied *Dukes* and concluded plaintiffs "have submitted substantial evidence of exactly what the Supreme Court found to be missing in [*Dukes*]: standardized conduct that could render [the defendant employer] liable to the class members for claims alleged."].)

Allstate disputes whether a company-wide practice existed of adjusters working off the clock. According to Allstate, it instructs adjusters not to begin work before they arrive at their first appointment. Allstate asserts that at most "the evidence shows that reactions differed from manager to manager and from employee to employee, purportedly leading some adjusters to work off-the-clock, while others did not." Allstate also asserts its policy is to pay for all overtime that adjusters work, and indeed, appellant concedes he received overtime pay 70 times.

We need not, however, address the accuracy of Allstate's assertions because doing so goes to the merits of the class claims. As our Supreme Court said in *Brinker, supra,* 53 Cal.4th at page 1024, inquiries into the merits as part of a certification motion are "closely circumscribed." We instead assume based on the evidence appellant and other adjusters put to the trial court that Allstate had a company-wide practice of adjusters working off-the-clock. (*Id.* at p. 1023 [court assumes claims have merit].) An unlawful practice may create commonality even if the practice affects class members differently. "[C]lass treatment does not require that all class members have been equally affected by the challenged practices—it suffices that the issue of whether the practice itself was unlawful is common to all." (*Jacks v. DirectSat USA, LLC* (N.D. Ill. 2012) 2012 WL 2374444, *6, but see *In re Bank of America Wage and Hour Employment Litigation* (D. Kan. 2012) 286 F.R.D. 572, 588 ["[E]ven if plaintiffs established the unofficial policy they allege the Bank maintained, there is no way in the class action context to prove the Bank's liability to each member because there is no evidence that each class member in

18

fact was affected by the unlawful policy.".) It may be true that some adjusters never worked off the clock, and such adjusters were thus not injured by Allstate's practice of adjusters working off the clock. But the existence of individuality as to damages does not defeat class certification. (*Jimenez, supra,* 2012 WL 1366052, *19 ["[O]vertime claims may present a number of individualized questions, including whether individual employees worked off-the-clock. [Citation.] Nonetheless, courts have certified classes and allowed collective actions to proceed notwithstanding such circumstances. . . . [¶] Here, Plaintiffs allege a company-wide policy of discouraging and limiting overtime."]; *Espinoza v. 953 Assocs. LLC, supra,* 280 F.R.D. at p. 130 ["Plaintiffs allege that Defendants failed to pay minimum wages and overtime compensation as a result of certain policies and practices. Although plaintiffs' claims may raise individualized questions regarding the number of hours worked and how much each employee was entitled to be paid, those differences go to the damages that each employee is owed, not to the common question of Defendants' liability."].)

## DISPOSITION

Let a writ of mandate issue directing the trial court to vacate its order entered on July 24, 2012, decertifying the "Off-the-Clock" class and the companion "Unfair Competition" class, and to issue a new order reinstating certification of those classes.


                                                    RUBIN, J.
WE CONCUR:



        BIGELOW, P. J.



        FLIER, J.


19